UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| PINNACLE GREAT PLAINS OPERATING COMPANY, LLC, an Arkansas Limited Liability Company,<br><br>     Plaintiff,<br><br>v.<br><br>WYNN DEWSNUP REVOCABLE TRUST; WYNN DEWSNUP, in his individual capacity as trustee of the Wynn Dewsnup Revocable Trust; 1 STOP REALTY, INC., and DOES INDIVIDUAL/ENTITIES I-XX,<br><br>     Defendants. | Case No. 4:13-cv-00106-EJL-CWD<br><br>**REPORT AND RECOMMENDATION RE: MOTIONS TO AMEND (DKTS. 62 and 63)** |
| WYNN DEWSNUP REVOCABLE TRUST; WYNN DEWSNUP, in his individual capacity as trustee of the Wynn Dewsnup Revocable Trust,<br><br>     Cross-Claimants,<br><br>v.<br><br>1 STOP REALTY, INC., a Minnesota corporation,<br><br>     Cross-Defendant. | |

**REPORT AND RECOMMENDATION RE: MOTIONS TO AMEND - 1**

# INTRODUCTION

Pending before the Court are two motions seeking to join new parties and add new claims to this lawsuit. First, Plaintiff Pinnacle Great Plains Operating Company filed a motion to modify the case management order and to amend its complaint to name Kirk Swenson, President of 1 Stop Realty, as an individual party defendant to this action. (Dkt. 62). Second, Defendant/Cross-claimant Dewsnup[1] filed a motion to join in Pinnacle's motion and also its own motion to amend his crossclaim to add Swenson and Roger Heller, Vice President of 1 Stop Realty, as cross-defendants in this action.

Pinnacle and Dewsnup assert joinder and amendment of the complaint and crossclaim are necessary due to new information revealed by Swenson and Heller during their depositions in early January of 2016. Specifically, the moving parties assert amendment is appropriate because they received new information regarding Swenson's and Heller's knowledge of the Bridge Farm water quality prior to Pinnacle's purchase, and also Swenson and Heller denied that they and 1 Stop Realty functioned as Pinnacle's broker for the Bridge Farm purchase. 1 Stop Realty opposes both motions and contends no new information was revealed by Swenson or Heller during their depositions.

The Court heard oral argument from the parties on both motions on May 31, 2016. After review of the record, consideration of the parties' arguments and relevant legal authorities, and otherwise being fully advised, the Court issues the following report and recommendation to deny both motions.

---

[1] Wynn Dewsnup Defendants/Cross-Claimants consist of both the Wynn Dewsnup Revocable Trust and Wynn Dewsnup in his individual capacity and as trustee of the Wynn Dewsnup Revocable Trust. The Court will refer to these parties collectively as "Dewsnup."

**REPORT AND RECOMMENDATION RE: MOTIONS TO AMEND - 2**

## FACTUAL BACKGROUND

This litigation arises from Dewsnup's October 2011 sale to Pinnacle of a 5,487–acre parcel of agricultural land near Malta, Idaho, known as "Bridge Farm." Specifically, Pinnacle claims Dewsnup and Pinnacle's purported broker, 1 Stop Realty, misrepresented the quality of the groundwater supply for Bridge Farm's irrigation system.

Critical to resolution of the pending motions is determining when 1 Stop Realty's officers, Swenson and Heller, became aware of the alleged problems with the quality of Bridge Farm's groundwater supply and when, through the process of discovery, Pinnacle became aware of Swenson's and Heller's knowledge of Bridge Farm's water quality issues. To better understand the parties' arguments, the Court will explain briefly the basic structure of 1 Stop Realty, how 1 Stop Realty learned about the Bridge Farm property, and 1 Stop Realty's relationship history with Pinnacle leading up to the Bridge Farm sale.

### I. 1 Stop Realty

1 Stop Realty is a Minnesota corporation that sells and purchases agricultural property. (Dkt. 62-2 at 8.) 1 Stop Realty's officers include President Kirk Swenson, and Vice President Roger Heller.[2] In addition to its officers, 1 Stop Realty employs an office manager, an assistant, and a website technician. It has also three sales associates who work as independent contractors. 1 Stop Realty operates out of two locations. The main

---

[2] It is unclear whether 1 Stop Realty has two vice presidents. During his deposition, Swenson testified that Wendy Forthum was a vice president. However, during the hearing on the pending motions, 1 Stop Realty's counsel represented that Swenson and Heller were 1 Stop Realty's only officers.

**REPORT AND RECOMMENDATION RE: MOTIONS TO AMEND - 3**

office is located in Kasson, Minnesota, and the other office is located in Olivia,

Minnesota. Swenson works from the Kasson office; Heller works out of the Olivia office.

## II. 1 Stop Realty's Introduction to Bridge Farm

In early 2010, 1 Stop Realty's client, Teays River Investments, LLC,[3] expressed

interest in expanding into the northwest United States and sought 1 Stop Realty's services

in its search for farmland in which to invest. (Dkt. 62-2 at 20.) Heller discovered Bridge

Farm and began preparing paperwork on the property to present to Teays.

In May of 2010, Heller and Swenson travelled to Idaho to tour Bridge Farm.

Afterward, Swenson sent an email to Teays informing them that he had visited Bridge

Farm, and recommending moving forward by submitting a letter of intent to the

Dewsnups. (Dkt. 64-2 at 16.) In the email, Swenson stated, among other things: Bridge

Farm "has really good water with inexpensive pumping cost….Nice deal, good water."

*Id.* Despite making this statement in his email, Swenson clarified during his recent

deposition that, at the time he sent the email, 1 Stop Realty had not yet investigated

Bridge Farm's water quality. (Dkt. 62-2 at 23.)

Throughout 2010, 1 Stop Realty continued to collect more information on Bridge

Farm for Teays. In late May of 2010, Garrett Dewsnup[4] emailed Pat Kelgen, Heller's

assistant, five pages of Bridge Farm water analysis lab results from the year 2003. (Dkt.

64-2 at 2-7.) Kelgen forwarded the results to Heller who then forwarded them to

---

[3] "Teays River Investments, LLC, is a privately-held holding company based in Zionsville, Indiana that invests in and manages assets in the agricultural sector." http://teaysinvestments.com/ (Last visited July 26, 2016) (attached hereto as Appendix A).

[4] Garrett Dewsnup's relationship to Wynn Dewsnup is not apparent in the record. In the Amended Complaint, Pinnacle alleges Garrett Dewsnup was an agent of Wynn Dewsnup. (Dkt. 35 at 4.)

**REPORT AND RECOMMENDATION RE: MOTIONS TO AMEND - 4**

Swenson. The lab results indicate "possible" and "significant" problems with Bridge Farm's water. *Id.* Swenson explained during his recent deposition that he and Heller discussed the 2003 lab results in 2010, and concluded that, given the out-dated nature of the reports, Bridge Farm's water quality would need to be re-tested during the due-diligence period prior to Teays' purchase of the farm. (Dkt. 62-2 at 56.)

Around this same time period, Heller had been in communication with Dewsnup's agronomist, Kyle Carpenter, who had worked on Bridge Farm for several years, to discuss Bridge Farm's soil and water quality. On June 28, 2010, Heller emailed Swenson to inform him about his discussion with Carpenter. Heller reported:

> Most of the soils are Genola which is Class IIe irrigated and a good one. Some of the others take more careful management as per the consultant.[5]

(Dkt. 64-2 at 26.)

Sometime around July of 2010, Swenson gained the impression from Teays that they did not want to move forward with the Bridge Farm purchase for "scalability" reasons (i.e., Teays was interested in a farm bigger than Bridge Farm). (Dkt. 64-2 at 27.) During the hearing, 1 Stop Realty argued that once Teays lost interest in Bridge Farm, 1 Stop Realty set aside and forgot about the paperwork it gathered on Bridge Farm.

### III. 1 Stop Realty Introduces Bridge Farm to Pinnacle

On December 29, 2010, Howard Halderman, the President and CEO of Halderman Farm Management Services, emailed several real estate brokers, including 1 Stop

---

[5] Swenson explained during his deposition that he gained the impression from the agronomist that Bridge Farm did not require the installation of a new well to improve its water quality. (Dkt. 62-2 at 56.)

**REPORT AND RECOMMENDATION RE: MOTIONS TO AMEND - 5**

Realty's President Swenson, about an investment opportunity for one of its institutional clients—Pinnacle.[6] Specifically, Pinnacle was seeking farmland. The email addressed to Swenson did not solicit him or 1 Stop Realty to act as Pinnacle's broker in the potential acquisition of the farmland investment.

On January 17, 2011, Swenson emailed Halderman to inform him about the Bridge Farm property. In the email, Swenson specified the price of the property and that Teays originally passed on its purchase. On June 16, 2011, Garrett Dewsnup sent 1 Stop Realty a lease proposal from one of the Dewsnup's Bridge Farm tenants. The proposal noted: "the farm has both soil and water borne salt challenges." (Dkt. 62-2 at 104.) When 1 Stop Realty later forwarded this information to Pinnacle, two pages, including the page which referenced Bridge Farm's "salt challenges," were omitted.

There is no dispute that 1 Stop Realty did not disclose the 2003 water analysis lab results to Pinnacle prior to Pinnacle's purchase of Bridge Farm. Swenson explained during his deposition that Pinnacle did not ask him or anyone from 1 Stop Realty to verify and reconcile the water rights on Bridge Farm in 2011. (Dkt. 62-2 at 66.) He indicated also that no advance funds were provided to 1 Stop Realty by Pinnacle to pay for any due diligence items. *Id.* On October 14, 2011, Pinnacle purchased Bridge Farm from the Dewsnups.

---

[6] Halderman was introduced to Swenson though his brother Richard Halderman. (Dkt. 64-3 at 4.) Howard Halderman had known Swenson for about thirteen or fourteen years. Halderman Farm Management Services and 1 Stop Realty had worked together in the past to acquire property for Teays.

**REPORT AND RECOMMENDATION RE: MOTIONS TO AMEND - 6**

## PROCEDURAL BACKGROUND

The procedural background of this matter is both lengthy and complicated. However, it is necessary for the Court to provide some detail to better explain how and when Pinnacle became aware through discovery of Swenson's and Heller's knowledge of Bridge Farm's water quality issues.

On March 5, 2013, Pinnacle filed its original complaint against Dewsnup for breach of its obligations under the Bridge Farm purchase agreement. (Dkt. 1.) On April 15, 2013, Dewsnup filed a motion to dismiss Pinnacle's Complaint. (Dkts. 3-4.) The parties informally agreed not to pursue discovery until after the Court's resolution of the motion to dismiss. On February 6, 2014, the Court entered an Order granting Dewsnup's motion to dismiss in part.[7] (Dkt. 19). Shortly thereafter, the parties stipulated to, and the Court approved, amendment of the Case Management Order, which lifted the informal discovery stay. (Dkt. 23.)

On or about October 3, 2014, Pinnacle received Dewsnup's responses to Pinnacle's first set of discovery requests. (Dkt. 29-1 at 16.) Ten days later, Pinnacle moved for leave to amend its complaint to assert fraud claims against Dewsnup. (Dkt. 29.)

On November 18, 2014, Pinnacle deposed Garrett Dewsnup. During his deposition, Mr. Dewsnup revealed that he provided prospective buyers, including Swenson, soil and water samples (the 2003 water analysis lab results) for Bridge Farm.

---

[7] The Court dismissed Wynn Dewsnup, the individual, as a defendant, but found that Pinnacle's complaint did not otherwise fail to state a claim upon which relief could be granted against the Wynn Dewsnup Revocable Trust.

**REPORT AND RECOMMENDATION RE: MOTIONS TO AMEND - 7**

(Dkt. 64-1 at 2.) Also in November of 2014, in response to a third party subpoena, 1 Stop Realty (prior to its inclusion as a party defendant) produced over 3,000 pages of materials related to the Bridge Farm transaction. *Id.*

On December 12, 2014, Pinnacle filed a motion for leave to join 1 Stop Realty as a party defendant and to assert new claims against 1 Stop Realty. (Dkt. 32.) Pinnacle did not to seek leave to join Swenson and Heller as individual party defendants at that time; however, both Swenson and Heller were identified in the proposed amended complaint as representatives of 1 Stop Realty who had knowledge of the Bridge Farm transaction. (Dkt. 32.)

On February 23, 2015, the Court granted Pinnacle's two motions to amend its complaint and to join 1 Stop Realty as a party defendant. (Dkt. 34.) Nearly one month later, 1 Stop Realty filed a third-party complaint against Dewsnup's Bridge Farm brokerage, Robert Jones Realty, Inc. (Dkt. 37.) On April 4, 2015, Dewsnup filed its answer to the amended complaint and filed also a cross-claim against 1 Stop Realty. (Dkt. 40.)

On May 7, 2015, Robert Jones Realty filed a motion to dismiss the third-party complaint. (Dkt. 46.) One week later, discovery reached a halt once more when the Court ordered a stay of all proceedings, with the exception of filings related to the motion to dismiss and written discovery propounded on 1 Stop Realty by Pinnacle, until the Court could address Robert Jones Realty's motion. (Dkt. 48.)

On June 11, 2015, in response to Pinnacle's written discovery, 1 Stop Realty produced documents to Pinnacle and Dewsnup related to its work and investigation of

**REPORT AND RECOMMENDATION RE: MOTIONS TO AMEND - 8**

Bridge Farm that 1 Stop Realty had collected when it was representing Teays. (Dkt. 64-1 at 2.) These disclosures included the 2003 Bridge Farm water analysis lab results, Swenson's personal notes from a 2010 telephone conference with Wynn Dewsnup which acknowledge, among other points, "salts + sodium in soils," and emails between Heller and Swenson which revealed that Heller had spoken to an agronomist regarding Bridge Farm's long term sustainability and the salinity of its soils. (Dkt. 64-2 at 1-27.) During the hearing on the pending motions, counsel for Pinnacle admitted she did not immediately review these documents because of the stay that was in place at the time.

The Court entered an Order on October 7, 2015, granting Robert Jones Realty's motion to dismiss the third-party-complaint, and lifting also the stay. (Dkt. 55.) On October 29, 2015, the Court conducted a telephonic status conference with the parties to establish new deadlines and to amend the Case Management Order. (Dkt. 59.) During the conference, the Court inquired whether the parties needed a new deadline for joinder of parties and amendment of pleadings. The inquiry and response follow:

> Court: One thing I should add, and I'm assuming, and I shouldn't assume, but that you do not need an amendment of pleadings deadline given that the pleadings have been amended multiple times in this case, is that a fair assumption Ms. Brailsford?[8]
>
> Brailsford: That's our assumption from my perspective, yes.
>
> Olsson: Yes, your honor, from my perspective.
>
> Rauer: yes your honor.

---

[8] Amada Brailsford is counsel for Pinnacle, Patricia Olson is counsel for Dewsnup, and Portia Rauer is counsel for 1 Stop Realty.

**REPORT AND RECOMMENDATION RE: MOTIONS TO AMEND - 9**

(Dkt. 64 at 3.)[9]

The Court issued an amended Case Management Order (Dkt. 58), establishing new deadlines for the completion of factual discovery, expert disclosures, mediation, and dispositive motions.[10] Because all parties represented to the Court that no new amendment of pleadings deadline was necessary, the Court did not include one in its order.

On January 7 and 8, 2016, Pinnacle deposed Swenson and Heller.[11] Pinnacle alleges 1 Stop Realty brought to the depositions an "original file of documents relating to Bridge Farm" which contained evidence of "1 Stop Realty's knowledge of sodium salts and soils." Dec. Brailsford, ¶ 6.

The parties participated in mediation on March 2, 2016, but were unable to settle their claims. On March 14, 2016, Pinnacle filed its Motion to Amend Pleadings to Join a Party and to Modify Case Management Order (Dkt. 62), seeking to join 1 Stop Realty's President, Swenson, as a party defendant and to assert new claims against him. (Dkt. 62.) On March 31, 2016, Dewsnup filed its Joinder and Motion for Leave to Join Parties and File Amended Cross-Claim. (Dkt. 63), seeking to join in Pinnacle's motion (Dkt. 62) and seeking also to add Swenson and Heller as cross-defendants and amend its cross-claim to assert new claims against Swenson and Heller.

---

[9] The Court listened to the audio recording, and confirmed the accuracy of the quote provided by 1 Stop Realty in its briefing.

[10] The Case Management Order also set trial to begin January 25, 2017.

[11] Counsel for 1 Stop Realty Portia Rauer was present during Swenson's deposition. While she represents 1 Stop Realty, it is not clear whether Rauer would represent Swenson and/or Heller individually if they are added as individual party defendants and cross-defendants.

**REPORT AND RECOMMENDATION RE: MOTIONS TO AMEND - 10**

## STANDARD OF LAW

A party seeking to amend a pleading after the deadline for amendments must satisfy the "good cause" standard of Rule 16(b) in addition to the more liberal standard for amendment of pleadings under Rule 15(a). Once the Court sets a case management schedule pursuant to Rule 16, the "schedule may be modified only for good cause and with the judge's consent." Fed.R.Civ.P. 16(b)(4). The "good cause" inquiry under Rule 16 "is not coextensive with an inquiry into the propriety of the amendment under ... Rule 15." *Johnson v. Mammoth Recreations, Inc.,* 975 F.2d 604, 609 (9th Cir.1992) (citation omitted). The focus of the good cause analysis is on "the diligence of the party seeking the extension." *Id.* Thus, the issue under Rule 16(b) is whether the "pretrial schedule ... cannot reasonably be met despite the diligence of the party seeking the extension." *Id.* (quoting Fed. R. Civ. P. Advisory Committee's Notes (1983 amendment)) (internal quotation marks omitted).

"Rule 16 was designed to facilitate more efficient disposition of cases by settlement or by trial." *Bright Harvest Sweet Potato Co. v. H.J. Heinz Co., L.P.*, 2014 WL 3341140, at *1 (D. Idaho July 7, 2014); citing *Johnson*, 975 F.2d 604 at 607-608. "If disregarded it would undermine the court's ability to control its docket, disrupt the agreed-upon course of the litigation, and reward the indolent and the cavalier." *Id.* (internal quotations omitted); *see also* Rule 16 Advisory Committee Notes (1983 Amendment). "When determining whether to grant a motion to amend a scheduling order, a court may also consider 'the existence or degree of prejudice to the party

**REPORT AND RECOMMENDATION RE: MOTIONS TO AMEND - 11**

opposing the modification.'" *Id.* (citing *Johnson*, 975 F.2d 604 at 608.) But, "[i]f that party was not diligent, the inquiry should end." *Johnson*, 975 F.2d 604 at 608.

## DISCUSSION

### I. Pinnacle's Motion to Amend Pleadings to Join Party and to Modify Case Management Order

Pinnacle seeks leave to join Swenson as a party defendant and to amend its complaint to assert new claims against Swenson.[12] Because Pinnacle seeks to join a party and amend its complaint after expiration of the joinder and amendment of pleadings deadline as set forth in the Court's Case Management Order (Dkt. 13), the Court must first determine whether Pinnacle has demonstrated good cause to warrant amendment of the case management order. For the following reasons, the Court finds Pinnacle has not demonstrated the requisite good cause and will recommend that its motion be denied.

Pinnacle asserts no amount of diligence would have allowed it to seek amendment before the expiration of the joinder of parties and amendment of pleadings deadline. In support of its motion, Pinnacle explains it was not aware of certain facts establishing Swenson's personal knowledge of the Bridge Farm water quality issues and his decision to withhold the information from Pinnacle until Swenson's deposition was taken on January 7, 2016. Specifically, Pinnacle alleges Swenson revealed for the first time during his deposition the following evidence:

- In May of 2010, Swenson personally received and reviewed the 2003 water analysis lab results from the Dewsnups which noted "possible and "significant" problems with water quality;

---

[12] Pinnacle does not seek to add Heller as an individual party Defendant.

**REPORT AND RECOMMENDATION RE: MOTIONS TO AMEND - 12**

- In June of 2010, Heller informed Swenson of the information Heller had learned from Bridge Farm's agronomist regarding the need for specific practices to address the high salt levels;

- In June of 2011, Swenson personally received and reviewed a lease proposal for Bridge Farm which noted that "the farm has both soil and water borne salt challenges;"

- Swenson withheld adverse information he had acquired regarding Bridge Farm's alleged poor water quality, including portions of the lease proposal which referenced Bridge Farm's "salt challenges;" and

- Swenson denied he represented Pinnacle as its broker during the Bridge Farm transaction. Rather, Swenson asserted he was a "facilitator."

1 Stop Realty argues Pinnacle has failed to establish the requisite good cause necessary to amend the case management order, because Swenson did not reveal new information during his deposition and because Pinnacle has been in possession of the necessary information to move to amend since June of 2015, at the latest. As discussed below, the Court agrees with 1 Stop Realty.

Long before June of 2015, Pinnacle was in possession of information that strongly suggested or indicated Swenson had received the Bridge Farm 2003 water analysis lab results from the Dewsnups in May of 2010. During his deposition taken on November 18, 2014, Garrett Dewsnup revealed that he provided prospective buyers, including Swenson, soil and water samples of Bridge Farm. (Dkt. 64-5 at 3.) On June 11, 2015, 1 Stop Realty, in response to Pinnacle's written discovery, produced documents related to its work and investigation of Bridge Farm that 1 Stop Realty had collected when it was representing Teays. Those disclosures included the 2003 water analysis lab results indicating "poor"

**REPORT AND RECOMMENDATION RE: MOTIONS TO AMEND - 13**

and "significant" problems with Bridge Farm's water quality—the documents Garrett Dewsnup referred to during his deposition. (Dkt. 64-2 at 3-7.)

Although Swenson admitted during his early 2016 deposition that he had reviewed the 2003 water analysis lab results sometime in 2010, given the evidence available to Pinnacle outlined above, Swenson's admission should not have come as a surprise. By June 11, 2015, Pinnacle had documentary evidence confirming Swenson had been sent these lab results as indicated by Garrett in November of 2014, and knew also that Swenson did not provide the 2003 lab results to Pinnacle before it purchased Bridge Farm.

Likewise, Pinnacle was in possession of information by June of 2015 demonstrating Swenson and Heller had consulted with the Dewsnup's agronomist regarding Bridge Farm's soils and salinity issues. In the June of 2015 disclosures referenced above, 1 Stop Realty provided an email from Heller to Swenson dated June 28, 2010. In the email, Heller informed Swenson he consulted with the agronomist, who found that some of the soils required more careful management than others. (Dkt. 64-2 at 26.) Also included in these same disclosures are Swenson's handwritten notes from a telephone conference he had with Wynn Dewsnup in 2010, which indicated "salt + sodium in soils" in regard to Bridge Farm. (Dkt. 64-2 at 11.) The notes also state "there are issues" next to the name of the agronomist. *Id.* at 12. By June of 2015, Pinnacle was in possession of documents demonstrating information they previously obtained that Swenson and Heller had been in communication with an agronomist regarding the

**REPORT AND RECOMMENDATION RE: MOTIONS TO AMEND - 14**

potential soil and salt problems with Bridge Farm, and that Swenson did not inform
Pinnacle of those discussions prior to Pinnacle's purchase of Bridge Farm.[13]

      With regard to the missing Bridge Farm lease proposal pages, this information
also was not revealed for the first time during Swenson's deposition. Pinnacle was in
possession of both versions (the complete and incomplete versions) of the proposal
months prior to the deposition. This is evidenced by the fact that Pinnacle's counsel
introduced both versions of the lease proposals as exhibits during Swenson's deposition.
Further, the Court does not find persuasive Pinnacle's argument that Swenson admitted
during his deposition that he *intentionally* omitted the missing pages of the lease proposal
regarding Bridge Farm's "salt challenges" when he transmitted a copy of the lease to
Pinnacle in June of 2011. During the deposition, Pinnacle's counsel asked Swenson to
compare the complete and incomplete lease proposals and pointed out to Swenson, before
he could answer her question, that "it looks like there is just two missing pages" from the
proposal sent to Pinnacle. Swenson merely acknowledged in response that two pages
were missing. Swenson did not explain why or how the two pages were omitted and did
not admit that he intentionally withheld the missing pages from Pinnacle.

---

[13] Pinnacle's motion cites to pages 202-203 of Swenson's deposition, and argues that Swenson revealed
for the first time specific practices recommended by the agronomist to address Bridge Farm's salt levels.
The Court reviewed the deposition testimony and could not discern any specific practices recommended
by the agronomist. Rather, in this portion of the deposition, Swenson connected the dots and explained
why he did not find the 2003 water analysis lab results, or issues with Bridge Farm's water problems,
significant. Specifically, Swenson explained that, because the lab results were out-dated, he thought the
results were not reliable and would need to be re-done. He explained also that the agronomist, who had
worked on Bridge Farm for several years, opined that issues regarding the water and salt levels could be
successfully mitigated and would not require installing a new well. The deposition testimony does not
mention what specific mitigation efforts, if any, the agronomist recommended.

**REPORT AND RECOMMENDATION RE: MOTIONS TO AMEND - 15**

Next, while Swenson personally denied representing Pinnacle as its broker in the Bridge Farm transaction for the first time during his deposition, the Court finds this representation immaterial to the diligence inquiry under Rule 16(b). If Pinnacle believed Swenson was its broker, Pinnacle could have easily identified and named Swenson as an individual defendant when Pinnacle moved to join 1 Stop Realty as a defendant.

In its Amended Complaint, Pinnacle alleges that 1 Stop Realty "brokered" the Bridge Farm transaction on Pinnacle's behalf and asserts claims against 1 Stop Realty under the Idaho Real Estate License Law.[14] Pursuant to Idaho Code § 5-2004, the definition of a "designated broker" is as follows:

> [A]n <u>individual</u> who is licensed as a real estate broker in Idaho and who is designated by the brokerage company to be responsible for the supervision of the brokerage company and the activities of any associated licensees in accordance with this chapter.

Idaho Code § 54-2004(20)(emphasis added).[15] From a simple reading of the statute, it is clear a party could properly name both the brokerage company and its designated broker as co-defendants in a lawsuit without alleging additional facts to personally implicate the individual broker. Thus, Pinnacle could have named Swenson—without any additional facts—when it moved to join 1 Stop Realty as a defendant in December of 2014.[16] The Court is perplexed further by Pinnacle's own admission in its opening brief that it had

---

[14] In 1 Stop Realty's Answer to the Amended Complaint, it denied all paragraphs in the Amended Complaint which allege 1 Stop Realty brokered the Bridge Farm transaction on Pinnacle's behalf. (Dkt. 37.)

[15] Pursuant to Minnesota law (1 Stop Realty, Inc is incorporated in Minnesota), the primary broker of a corporation is defined as: "each officer of the corporation who is individually licensed to act as broker for the corporation." Minn. Stat. § 82.55.

[16] Swenson's identity, regardless of whatever role he actually played was transparent and known to Pinnacle throughout the entire Bridge Farm transaction. In December of 2010, Halderman emailed Swenson directly to inquire about investment farm properties for his institutional client—Pinnacle.

**REPORT AND RECOMMENDATION RE: MOTIONS TO AMEND - 16**

evidence that Heller, Swenson, or both received information about Bridge Farm's water quality issues when it moved to add 1 Stop Realty—if Pinnacle had this information, why did it not seek to add Swenson or Heller when it moved to add 1 Stop Realty?

Moreover, two additional facts contradict and undercut Pinnacle's assertion that it was diligent in moving earlier for amendment of the case management order. First, Pinnacle's counsel represented at the October 29, 2015 status conference that a new amendment of pleadings deadline would not be necessary. In her brief, Pinnacle's counsel states that, although she was highly suspicious of Swenson's behavior, she did not want to assert new claims against Swenson until after she took his deposition. Despite her suspicion (based on information, belief, and documents received to date), Pinnacle assured the Court that no additional amendments to pleadings were anticipated. Pinnacle has articulated no reason to allow it to recant that representation. *See Jackson*, 852 F.2d at 1134 (citing *Jauregui v. City of Glendale*, 852 F.2d 1128, 1134 (9th Cir. 1988)) (concluding that a party was bound to facts to which it stipulated, without objection, in a Rule 16 order).

The Court is concerned also about the timing of Pinnacle's motion to amend. Although Pinnacle asserts the new information learned during Swenson's deposition warrants amendment, Pinnacle deposed Swenson on January 7, 2016, and did not file its motion to amend until March 14, 2016. The motion comes over two months after Pinnacle discovered this allegedly "new" information. This additional delay undercuts Pinnacle's argument that it was diligent in seeking amendment of the case management order.

**REPORT AND RECOMMENDATION RE: MOTIONS TO AMEND - 17**

For the reasons outlined above, the Court finds Pinnacle has not established the requisite diligence necessary to warrant amendment of the case management order. Because Pinnacle has not demonstrated that its request for leave to amend its Second Amended Complaint is supported by good cause, "the inquiry should end." *See Johnson*, 975 F.2d at 609. However, as the Ninth Circuit permits, this Court will consider also the "existence or degree of prejudice to the party opposing the modification" because those factors "supply additional reasons to deny a motion." *Id.; see also Bright Harvest Sweet Potato Co. v. H.J. Heinz Co., L.P.*, 2014 WL 3341140, at *2 (D. Idaho July 7, 2014) (considering prejudice to the party opposing modification to the case management order).

 While the party opposing the motion is 1 Stop Realty, for all intents and purposes, 1 Stop Realty is Swenson. 1 Stop Realty is a small real estate company with less than ten employees and independent contractors working for the company and Swenson is the President and CEO of 1 Stop Realty. Accordingly, the Court would be remiss if it did not consider prejudice to both 1 Stop Realty and Swenson, if Swenson is added as an individually named defendant.

Pinnacle's motion to add Swenson is not simply an attempt to clarify the semantics of the complaint to allege that Swenson was Pinnacle's "broker," and that 1 Stop Realty was Pinnacle's "brokerage."[17] Rather, adding Swenson as an individual

---

[17] As explained above, the statute is clear—a party can name both the brokerage and the individual broker in a lawsuit. Although Pinnacle did not name Swenson as its purported individual broker in the lawsuit, Swenson was identified at the outset and included in the proposed amendment to add 1 Stop Realty, back in December of 2014. 1 Stop Realty denied allegations that it acted as Pinnacle's broker in its Answer, filed March 20, 2015. (Dkt. 37.)

**REPORT AND RECOMMENDATION RE: MOTIONS TO AMEND - 18**

defendant is a substantive change that would undoubtedly alter the dynamics of this entire litigation—prejudicing both 1 Stop Realty and Swenson.

Pinnacle's proposed third amended complaint seeks to allege violations of the Idaho Brokerage Representation Act, Negligence Per Se, and fraud against both 1 Stop Realty and against Swenson individually. (Dkt. 62 at 4.) The attempt to assert liability against Swenson, rather than impute his actions or omissions to 1 Stop Realty, is a significant and substantive change to this litigation. In addition, the proposed Third Amended Complaint alleges new violations of RICO and the Idaho Racketeering Act against Swenson individually. These claims are not insignificant. And, assuming the new allegations against Swenson are not otherwise precluded by the statute of limitations or some other grounds, if added as an individual defendant, Swenson would need time to find representation, respond to the allegations, conduct his own discovery, and file pretrial motions. This essentially would require this litigation to, begin anew.

This matter has been pending for over three years; allowing an amendment at this point, when Pinnacle could have moved to add Swenson as a defendant as early as November of 2014 when Pinnacle moved to add 1 Stop Realty, is not justified.[18] Accordingly, because Pinnacle was not diligent in seeking to add Swenson as a party, and because amendment of the complaint would prejudice both 1 Stop Realty and Swenson and would significantly disrupt the current deadlines without good cause, the Court will recommend Pinnacle's Motion to Amend be denied.

---

[18] The Court recently extended various deadlines, including the dispositive motion deadline and trial date to account for the delay caused by the pending motions. (Dkt. 73.)

**REPORT AND RECOMMENDATION RE: MOTIONS TO AMEND - 19**

**II. Dewsnup's Motion to Join Pinnacle's Motion to Amend and Motion for Leave to Join Parties and File Amended Crossclaim**

Dewsnup seeks leave to add Swenson and Heller as cross-defendants and to amend its crossclaim to assert new claims against Heller and Swenson, individually. For the reasons that follow, the Court will recommend that Dewsnup's motion be denied.

Fed. R. Civ. P. 13(h) permits defendants, under certain circumstances,[19] to join additional parties (who are not original to the litigation) to a crossclaim. *See* Fed. R. Civ. P. 13(h)("Rules 19 and 20 govern the addition of a person as a party to a counterclaim or crossclaim."); *Hawkins v. Berkeley Unified Sch. Dist.*, 250 F.R.D. 459, 462 (N.D. Cal. 2008). However, a party seeking to join new parties and amend its pleading after the deadline for joinder and amendments must satisfy "good cause," or establish diligence in seeking amendment pursuant to Rule 16(b) to warrant amendment of the case management order.

Dewsnup has not established good cause to warrant amendment of the case management order. Dewsnup's reasons in support of its motion to add new cross-defendants and amend its crossclaim are similar to those made by Pinnacle as described above; Dewsnup's motion focuses mainly on Swenson's and Heller's denials during their depositions that neither of them functioned as Pinnacle's broker or agent in connection with the Bridge Farm transaction. As discussed above, Swenson's and Heller's denials of acting as Pinnacle's broker are immaterial to the diligence inquiry under Rule 16(b).

---

[19] Dewsnup provided no authority by rule or by case law in support of it request to join nonparties as cross-defendants.

**REPORT AND RECOMMENDATION RE: MOTIONS TO AMEND - 20**

Dewsnup has had access to the same information as Pinnacle necessary to support individual crossclaims against Swenson and Heller for several months. Dewsnup could have named either Swenson, Heller, or both, as early as April 6, 2015, when he filed his crossclaim against 1 Stop Realty; or shortly after March of 2015, when 1 Stop Realty denied the allegations in Dewsnup's crossclaim that 1 Stop Realty brokered the Bridge Farm transaction on behalf of Pinnacle; or, at the very latest, in June of 2015, when 1 Stop Realty produced documents related to its work and investigation of Bridge Farm that 1 Stop Realty had compiled when it was representing Teays. Despite having sufficient knowledge and belief about this information and receiving documents confirming the information by June of 2015, Dewsnup's counsel represented during the October 29, 2015 status conference that a new amendment of pleadings deadline would not be necessary.

The timeliness of Dewsnup's motion in relation to discovering purportedly new information during the early January, 2016 depositions undermines Dewsnup's diligence in seeking amendment of the case management order. Heller and Swenson were deposed on January 7 and 8 of 2016. Dewsnup waited until March 31, 2016—fifty seven days after the depositions were taken—to file their motion. (Dkt. 63.) Dewnsup offered no explanation in his brief or during the hearing to explain the delay.

**REPORT AND RECOMMENDATION RE: MOTIONS TO AMEND - 21**

The Court finds Dewsnup was not diligent in seeking amendment of the case management order so he could move to add individual cross-defendants and amend his crossclaim.[20] Accordingly, the Court will recommend Dewsnup's motion be denied.

## CONCLUSION

Because Pinnacle and Dewsnup have failed to demonstrate diligence to support a finding of good cause to amend the case management order, and because prejudice to 1 Stop Realty would result if Swenson or Heller is added as an individual party defendants, the Court will recommend both motions be denied.

## RECOMMENDATION

**NOW THEREFORE IT IS HEREBY RECOMMENDED:**

1) Pinnacle's Motion to Amend Pleadings to Join a Party and to Modify Case Management Order (Dkt. 62) be **DENIED**; and

2) Dewsnup's Motion to Join Pinnacle's Motion and Motion for Leave to Join Parties and File Amended Cross-Claim Motion (Dkt. 63) be **DENIED**.

Written objections to this Report and Recommendation must be filed within fourteen (14) days pursuant to 28 U.S.C. § 636(b)(1) and Dist. Idaho L. Rule 72.1(b), or as a result of failing to do so, that party may waive the right to raise factual and/or legal objections to the United States Court of Appeals for the Ninth Circuit.

Dated: **July 26, 2016**

Honorable Candy W. Dale
United States Magistrate Judge

---

[20] The same prejudice analysis above regarding individual liability versus imputed liability regarding Swenson applies also to Heller.

**REPORT AND RECOMMENDATION RE: MOTIONS TO AMEND - 22**

## Appendix A

Teays River Investments, LLC - Agricultural Investments

