UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

PINNACLE GREAT PLAINS
OPERATING COMPANY, LLC., an
Arkansas Limited Company,

               Plaintiff,

      v.

1 STOP REALTY, INC., a Minnesota
corporation,

              Defendant.

Case No. 1:13-CV-00106-EJL-CWD

**MEMORANDUM DECISION AND
ORDER**

Pending before the Court in the above entitled matter is Defendant 1 Stop Realty, Inc.'s (1 Stop Realty) Motion for Summary Judgment. (Dkt. 81.) The matter is fully briefed and ripe for this Court's consideration.

Having fully reviewed the record, the Court finds that the facts and legal arguments are adequately presented in the briefs and record.  Accordingly, in the interest of avoiding further delay, and because the Court conclusively finds that the decisional process would not be significantly aided by oral argument, this matter shall be decided on the record before this Court without oral argument.

## FACTUAL BACKGROUND

The Court generally restates the factual background from the Report and Recommendations, Dkts, 54 and 75. The Court notes that based on settlement agreements

MEMORANDUM DECISION AND ORDER - 1

that have been entered, the only remaining claims are those between Plaintiff Pinnacle Great Plains Operating Company, LLC (Pinnacle) and Defendant 1 Stop Realty

This litigation arises from Defendants Wynn Dewsnup Revocable Trust and Wynn Dewsnup's (collectively referred to as "Dewsnups") October 2011 sale to Pinnacle of a 5,487–acre parcel of agricultural land near Malta, Idaho, known as "Bridge Farm." Specifically, Pinnacle claims the Dewsnups and Pinnacle's purported broker, 1 Stop Realty, misrepresented the quality of the groundwater supply for Bridge Farm's irrigation system.

1 Stop Realty is a Minnesota corporation which holds brokerage licenses and sells and purchases agricultural property. (Dkt. 62-2 at 8, 12.) 1 Stop Realty's officers include President Kirk Swenson, and Vice President Roger Heller. In addition to its officers, 1 Stop Realty employs an office manager, an assistant, and a website technician. It has also three sales associates who work as independent contractors. 1 Stop Realty operates out of two locations. The main office is located in Kasson, Minnesota, and the other office is located in Olivia, Minnesota. Swenson works from the Kasson office; Heller works out of the Olivia office.

In early 2010, 1 Stop Realty's client, Teays River Investments, LLC, expressed interest in expanding into the northwest United States and sought 1 Stop Realty's services in its search for farmland in which to invest. (Dkt. 62-2 at 20.) Heller discovered Bridge Farm and began preparing paperwork on the property to present to Teays.

MEMORANDUM DECISION AND ORDER - 2

In May of 2010, Heller and Swenson travelled to Idaho to tour Bridge Farm. Afterward, Swenson sent an email informing Teays he had visited Bridge Farm, and recommending moving forward by submitting a letter of intent to purchase the property to the Dewsnups. (Dkt. 64-2 at 16.) In the email, Swenson stated, among other things: Bridge Farm "has really good water with inexpensive pumping cost....Nice deal, good water." *Id.* Despite making this statement in his email, Swenson clarified during his recent deposition that, at the time he sent the email, 1 Stop Realty had not yet investigated Bridge Farm's water quality. (Dkt. 62-2 at 23.)

Throughout 2010, 1 Stop Realty continued to collect more information on Bridge Farm for Teays. In late May of 2010, Garrett Dewsnup emailed Pat Kelgen, Heller's assistant, five pages of Bridge Farm water analysis lab results from the year 2003. (Dkt. 64-2 at 2-7.) Kelgen forwarded the results to Heller who then forwarded them to Swenson. The lab results indicate "possible" and "significant" problems with Bridge Farm's water. *Id.* Swenson admitted in his deposition that he and Heller had discussed the 2003 lab results in 2010, and concluded that, given the out-dated nature of the reports, Bridge Farm's water quality would need to be re-tested during the due-diligence period prior to Teays' purchase of the farm. (Dkt. 62-2 at 56.)

Around this same time period, Heller had been in communication with Dewsnup's agronomist, Kyle Carpenter, who had worked on Bridge Farm for several years, to discuss Bridge Farm's soil and water quality. On June 28, 2010, Heller emailed Swenson to inform him about his discussion with Carpenter. Heller reported:

MEMORANDUM DECISION AND ORDER - 3

> Most of the soils are Genola which is Class IIe irrigated and a good one. Some of the others take more careful management as per the consultant.

(Dkt. 64-2 at 26.)

Sometime around July of 2010, Swenson gained the impression from Teays that they did not want to move forward with the Bridge Farm purchase for "scalability" reasons (i.e., Teays was interested in a farm bigger than Bridge Farm). (Dkt. 64-2 at 27.)  Once Teays lost interest in Bridge Farm, 1 Stop Realty maintains its agents set aside and forgot about the paperwork they had gathered on Bridge Farm.

On December 29, 2010, Howard Halderman, the President and CEO of Halderman Farm Management Services, emailed several real estate brokers, including 1 Stop Realty's President Swenson, about an investment opportunity for one of its institutional clients—Pinnacle. Specifically, Pinnacle was seeking farmland. The email addressed to Swenson did not directly solicit him or 1 Stop Realty to act as Pinnacle's broker in the potential acquisition of the farmland investment.

On January 17, 2011, Swenson emailed Halderman to inform him about the Bridge Farm property. In the email, Swenson specified the price of the property and that Teays originally passed on its purchase. On June 16, 2011, Garrett Dewsnup sent 1 Stop Realty a lease proposal from one of the Dewsnup's Bridge Farm tenants. The proposal noted: "the farm has both soil and water borne salt challenges." (Dkt. 62-2 at 104.) When 1 Stop Realty later forwarded this information to Pinnacle, two pages, including the page which referenced Bridge Farm's "salt challenges," were omitted.

MEMORANDUM DECISION AND ORDER - 4

There is no dispute that 1 Stop Realty did not disclose the 2003 water analysis lab results to Pinnacle prior to Pinnacle's purchase of Bridge Farm. Swenson explained during his deposition that Pinnacle did not ask him or anyone else from 1 Stop Realty to verify and reconcile the water rights on Bridge Farm in 2011. (Dkt. 62-2 at 66.) He indicated no advance funds were provided to 1 Stop Realty by Pinnacle to pay for any due diligence items. *Id.*

On October 14, 2011, Pinnacle purchased Bridge Farm from the Dewsnups. The Dewsnups' broker in the sale was Robert Jones Realty, Inc. It is unclear from the record who the real estate brokerage representing Pinnacle was at closing on Bridge Farm as the Court could not find the closing statements in the record which would indicate which brokerages received monies from the sale of Bridge Farm from the Dewsnups and Pinnacle.

It is undisputed that Pinnacle paid a commission or some form of compensation to 1 Stop Realty for its services related to Bridge Farm. Pinnacle claims in this litigation that 1 Stop Realty acted as its broker on the purchase. 1 Stop Realty claims it was not Pinnacle's broker on the purchase but acknowledges it was involved in the Bridge Farm transaction. Swenson testified in his deposition 1 Stop Realty was more of a "facilitator." It is unclear from the record before the Court exactly what Halderman Farm Management Service's role was in the purchase or if another brokerage was also involved in representing Pinnacle.

Pinnacle's Second Amended Complaint alleges 1 Stop Realty was its real estate broker in the transaction and it failed to disclose "its knowledge of significant water quality issues on the property." (Dkt. 35 p.7). The Second Amended Complaint alleges three

MEMORANDUM DECISION AND ORDER - 5

specific causes of action against 1 Stop Realty. Count IV alleges 1 Stop Realty violated its statutory duties as its real estate broker under the Idaho Real Estate Brokerage Representation Act (Brokerage Act) by failing to disclose and actively concealing adverse material facts. Count 5 alleges 1 Stop Realty's alleged violation of the Brokerage Act was negligence *per se*. Count VI alleges 1 Stop Realty committed fraud when it allegedly violated the Brokerage Act.

1 Stop Realty argues that summary judgment should be granted in its favor as the Brokerage Act is unenforceable against 1 Stop Realty because:  (1) 1 Stop Realty is not a brokerage as defined in the statute; (2) there is no written broker's agreement as required by the statute creating the requisite relationship; (3) payment of a commission does not create the requisite broker relationship; and (4) no duties were owed to Pinnacle as a customer. Finally, 1 Stop Realty argues Pinnacle cannot prove its claim of fraud by clear and convincing evidence.

Pinnacle maintains the motion for summary judgment should be denied as 1 Stop Realty is misreading the applicable statutes. Pinnacle argues 1 Stop Realty was its broker in the deal based on an exchange of emails and 1 Stop Realty breached its duties owed to Pinnacle when it withheld adverse information. Pinnacle also argues the evidence of fraud has been established by clear and convincing evidence.

MEMORANDUM DECISION AND ORDER - 6

## STANDARD OF REVIEW

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327.

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). Material facts are those that may affect the outcome of the case. *See id*. at 248.

The moving party is entitled to summary judgment if that party shows that each issue of material fact is not or cannot be disputed. To show the material facts are not in dispute, a party may cite to particular parts of materials in the record, or show that the materials cited do not establish the presence of a genuine dispute, or that the adverse party is unable to produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A)&(B); *see T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex*, 477 U.S. at 322). The Court must consider "the

MEMORANDUM DECISION AND ORDER - 7

cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

Material used to support or dispute a fact must be "presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Affidavits or declarations submitted in support of or opposition to a motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

The Court does not determine the credibility of affiants or weigh the evidence set forth by the non-moving party. All inferences which can be drawn from the evidence must be drawn in a light most favorable to the nonmoving party. *T.W. Elec. Serv.*, 809 F.2d at 630-31 (internal citation omitted).

Rule 56(e)(3) authorizes the Court to grant summary judgment for the moving party "if the motion and supporting materials–including the facts considered undisputed–show that the movant is entitled to it." The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby*, 477 U.S. at 252.

## ANALYSIS

**1.    Is the Idaho Real Estate Brokerage Representations Act enforceable against 1 Stop Realty?**

Defendant 1 Stop Realty claims it cannot be held liable under the Idaho Real Estate Brokerage Representation Act as it was not a "brokerage" as defined in the statute because

there was not a designated broker for the brokerage who was a "licensed real estate broker" in Idaho.

The transaction in this case did not meet the best practices of real estate representation on many levels which undoubtedly led to the need for litigation. But this first issue in the motion for summary judgment is not a difficult legal question for the Court. Interpretation of a legislative act presents a pure question of law. *Mayer v. TPC Holdings, Inc.*, 370 P.3d 738 (Idaho 2016). The issue can be decided as a matter of law simply by applying the unambiguous statutes. Title 54 of the Idaho Code sets forth Idaho Real Estate License Law. Sections 54-2011 through 54-2081 may be cited as "Idaho Real Estate License Law" (License Law). Idaho code § 54-2001.

Sections 54-2082 through 54-2098 may be cited as "the Idaho Real Estate Brokerage Representation Act" (Brokerage Act). Idaho Code § 54-2082. Section 54-2083, provides the definitions for §§ 54-2082 through 54-2098. Relevant definitions for purposes of this motion are:

> (4) "Brokerage" means a licensed designated broker, the licensed real estate business represented by the broker and its associated licensees.
>
> (5) "Client" means a buyer or seller, or prospective buyer or seller, or both who have entered into an express written contract or agreement with a brokerage for agency representation in a regulated real estate transaction.
>
> (6) "Customer" means a buyer or seller, or prospective buyer or seller who is not represented in an agency relationship in a regulated real estate transaction.
> . . .

MEMORANDUM DECISION AND ORDER - 9

(10) "Idaho real estate license law and rules" means Chapter 20, title 54, Idaho Code, and all administrative rules promulgated thereunder.

. . .

(14) "Regulated real estate transaction" means those real estate transactions for which a real estate license is required under chapter 20, title 54, Idaho Code

. . .

(16) "Representation agreement" or "contract for representation" means a written agreement between a buyer, seller, or both, and a real estate brokerage for agency representation in a regulated real estate transaction. A representation agreement under this chapter can only be made in writing, and cannot be made orally or by assumption or implication.

Because the Brokerage Act incorporates *all* of Chapter 20, Title 54 into its definition of "Idaho real estate license law and rules," the Brokerage Act includes the real estate laws included in Idaho Code §§ 54-2001 through 54-2081. To read and construe the Brokerage Act in any other manner would be nonsensical.

Idaho Code § 54-2002 clearly states licensure is required in order for a person to engage in the business or act in the capacity of a real estate broker or real estate salesperson. The statute clarifies "any person who engages in the business or acts in the capacity of real estate broker or salesperson in this state, with or without and Idaho real estate license" has submitted to the jurisdiction of the state of Idaho and shall be subject to all penalties and remedies available under Idaho law for any violation of chapter 20. *Id.* "Person" is defined in Idaho Code §54-2004(32) to mean an individual or any legal business entity. "Real estate broker" is defined as "[a]ny person other than a real estate salesperson, who, directly or indirectly, while acting for another, for compensation or a promise or an expectation

MEMORANDUM DECISION AND ORDER - 10

thereof, engages in any of the following: sells, lists, buys, or negotiates, or offers to sell, list, buy or negotiate the purchase, sale, option or exchange of real estate or any interest therein or business opportunity or interest therein for others." Idaho Code § 54-2004(36).

It is an illogical reading of Chapter 20, Title 54 as a whole for 1 Stop Realty to argue that because it did not have a licensed Idaho broker working for the brokerage firm, it does not have to follow the Idaho real estate license laws. The statutes are clear and unambiguous: if 1 Stop Realty acted as a brokerage either under a written brokerage agreement or in representing a "customer" in the Bridge Farm transaction it was required to follow Idaho's real estate laws. To hold otherwise would encourage non-Idaho licensed real estate firms and salespersons to conduct real estate transactions in Idaho without any duty of having to comply with the laws set forth in Chapter 20, Title 54.

Therefore, as a matter of law, the Court finds the argument of no liability since 1 Stop Realty was not licensed brokerage in Idaho and did not have a licensed Idaho broker working for the brokerage is without merit. Moreover, the argument is disingenuous as 1 Stop Realty was aware of the need to comply with the real estate laws of other states as it held numerous brokerage licenses outside its home state based on the fact it is involved in real estate deals in other states.

**2.      Was there a written brokerage agreement between Pinnacle and 1 Stop Realty?**

For purposes of this motion for summary judgment, the Court finds Pinnacle has not carried its burden to establish there was a "written agreement" as specifically required by Idaho Code § 54-2084 to create a brokerage agency relationship between Pinnacle as the client and 1 Stop Realty as its real estate brokerage in the real estate transaction.

MEMORANDUM DECISION AND ORDER - 11

Pinnacle acknowledges the lack of a written agreement signed by both parties, but argues there is a written document identifying 1 Stop Realty as Pinnacle's broker. Pinnacle refers the Court to the REPA contained in Pinnacles Statement of Facts, at ¶32. Pinnacle also points to an email exchange.

After reviewing the cited documents, the Court finds that neither the REPA nor the emails, alone or together, form a binding contract between the parties. Material terms are not defined in the emails and there is no adoption of the terms included in the email in a signed written brokerage agreement.

Both parties to this dispute are sophisticated entities who employ individuals who knew or should have known how to execute binding agreements for real estate transactions concerning agricultural properties. Per Idaho Code §§ 54-2083(16) and 54-2084, there can be no brokerage agreement orally or by implication. Thus, as a matter of law, the Court finds Pinnacle and 1 Stop Realty did not enter into a brokerage agreement. Therefore, Pinnacle may not argue the duties of a brokerage to a "client" as set forth in Idaho Code §54-2087 applied to its relationship.

Whether or not the emails and any oral agreements of the parties rise to the level of a "customer service agreement" or "compensation agreement" is a separate issue. The Court finds pursuant to Idaho Code §54-2086 a broker may have legal duties to a buyer with whom it does not have a written brokerage agreement. "The proper analysis is to look at the relationship between the particular brokerage and the buyer or seller and determine whether the party stand as a client or a customer of that particular brokerage." *State of Idaho Real Estate Comm'n v. Nordling*, 22 P.3d 105, 109 (Idaho 2001). There is no

requirement that a customer or commission agreement be in writing. *Johnson v. McPhee*, 210 P.3d 563 (Idaho Ct. App. 2009).

**3.      Does payment of a commission or fee create the requisite brokerage relationship?**

It is undisputed 1 Stop Realty was paid a $200,000 commission, facilitator fee or finder's fee relating to Pinnacle's purchase of Bridge Farm. The payment is assumed to flow from an agreement or contract (which may even be oral) between Pinnacle and 1 Stop Realty as there would be no reason for Pinnacle to pay 1 Stop Realty such a significant sum unless there was an agreement or contract between the parties. However, the Court cannot find in the record a written contract or closing statement showing the amount of the commission or fee or why exactly Pinnacle paid money to 1 Stop Realty.

For purposes of this motion, the Court assumes based on the undisputed facts presented that the monies paid to 1 Stop Realty were for real estate services rendered by 1 Stop Realty for the benefit of Pinnacle on the Bridge Farm purchase. Neither party denies they had a business relationship, but the parties do dispute the nature of that business relationship. Because 1 Stop Realty is a real estate brokerage, the Court finds the payment received from Pinnacle created a real estate broker relationship under the Idaho real estate laws. The fact Pinnacle may have also been represented by the Halderman Group or Karst, does not absolve 1 Stop Realty of liability it independently had under the Idaho real estate laws.

MEMORANDUM DECISION AND ORDER - 13

**4.   Were duties owed to Pinnacle under Idaho's real estate statutes even if there was no written brokerage agreement?**

1 Stop Realty claims because there was no written brokerage agreement, it did not owe *any* brokerage duties to Pinnacle. Pinnacle maintains it was a "client" under the statute.

As discussed earlier, without a written brokerage agreement between the parties, the Court finds Pinnacle cannot be a brokerage "client" of 1 Stop Realty. However, the Court also finds there is genuine issues of material fact regarding whether Pinnacle was a "customer" of 1 Stop Realty as defined by Idaho Code § 54-2083(7).  If Pinnacle satisfies the definition of a "customer" based on its agreement to pay a commission or fee to 1 Stop Realty for its real estate services on the Bridge Farm transaction, then 1 Stop Realty as a brokerage (although not licensed in Idaho) may have owed certain duties of a brokerage to a "customer" under Idaho Code §54-2086. Stated another way, while 1 Stop Realty claims it cannot be responsible for duties owed to a "client," there are still duties owed to "customers" that may apply to the contested facts in this case.

Clearly at issue in this case is the brokerage duty owed to a "customer" under §54-2086(1)(d): to disclose to the buyer/customer all adverse material facts actually known or which reasonable should have been known by the licensee [or in this case the non-licensee performing real estate services of a brokerage in Idaho]. Based on the record before this Court, there are genuine issues of a material facts regarding whether 1 Stop Realty disclosed to Pinnacle all adverse material facts known to 1 Stop Realty via its real estate agents (Swenson and Heller).

MEMORANDUM DECISION AND ORDER - 14

5.      **Was adequate notice provided to 1 Stop Realty under the Complaint or Amended Complaint?**

1 Stop Realty also argues it was not put on notice of claims outside the Brokerage Act as that was the only act cited in the Complaint or Amended Complaint. The Court finds this argument is without merit as the Brokerage Act includes by its own definitions all of Chapter 20, Title 54. Therefore, 1 Stop Realty was on notice of the applicability of the Brokerage Act to non-licensed out-of-state brokerages via the incorporated License Law.

6.      **Is there clear and convincing evidence of fraud?**

1 Stop Realty argues Pinnacle has failed to establish its claim of fraud by clear and convincing evidence. 1 Stop Realty agrees omission of information may constitute fraud when a duty to disclose exists. *Humphries v. Becker*, 366 P.3d 1088, 1096 (Idaho 2016). Because the Court has found that a genuine issue of material fact exists regarding whether Pinnacle was a "customer" to whom 1 Stop Realty owed a statutory duty to disclose adverse information, the claim for fraud should be allowed to proceed.

Pinnacle has the burden of proving the elements of fraud by clear and convincing evidence. *G & M Farms v. Funk Irrigation Co.,* 808 P.2d 851 (Idaho 1991). The elements of fraud are: (1) a statement or a representation of fact; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity; (5) the speaker's intent that there be reliance; (6) the hearer's ignorance of the falsity of the statement; (7) reliance by the hearer; (8) justifiable reliance; and (9) resultant injury. *Hines v. Hines,* 934 P.2d 20, 24 (Idaho 1997).

The Court acknowledges the facts relating to the elements of fraud are disputed in this case and summary judgment cannot be granted on this claim. 1 Stop Realty argues that Pinnacle's reliance cannot be justifiable based on the fact it hired another party to conduct due diligence on the property.  As to this legal argument regarding an element of the fraud claim, the Court agrees with Pinnacle. Under Idaho law, "[i]t is not a defense that a party alleging fraud could have ascertained the truth by conducting a more thorough investigation." *Watson v. Weick*, 112 P.3d 788, 792 (Idaho 2005).

In reviewing the record in this matter, the Court finds Pinnacle has established facts, which if viewed in a light most favorable to Pinnacle, could allow a jury to find by clear and convincing evidence fraud on the part of 1 Stop Realty. Accordingly, summary judgment on this claim must be denied. Whether Pinnacle has established all of the required elements of a fraud based on 1 Stop's alleged omissions or misrepresentations claim by clear and convincing evidence is a jury question.

## CONCLUSION

The record is undisputed that 1 Stop Realty engaged directly or indirectly in providing some real estate services in the Bridge Farm transaction. Genuine issues of material fact exist that prevent summary judgment from being granted in 1 Stop Realty's favor. While the Court determined as a matter of law that a written brokerage agreement was not executed and a brokerage-client relationship was not created, a jury will have to determine the exact nature and scope of the relationship between Pinnacle and 1 Stop Realty and whether any statutory duties owed to a Pinnacle as a "customer" were breached

MEMORANDUM DECISION AND ORDER - 16

by 1 Stop Realty. The jury will also have to determine whether Pinnacle can establish its fraud claim by clear and convincing evidence.

## ORDER

**NOW THEREFORE IT IS HEREBY ORDERED:**

1.   Defendant 1 Stop Realty's Motion for Summary Judgment (Dkt. 81) is **DENIED**.

2.   Due to the unavailability of a courtroom in Pocatello, the trial set on April 18, 2017 in Pocatello is VACATED.

3.   The parties shall meet and confer and contact Diane McDonald, at diane_mcdonald@id.uscourts.gov, within fourteen (14) days of the date of this order indicating if they would like to proceed with a new trial setting.

DATED: March 16, 2017

Edward J. Lodge
United States District Judge